IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CYNTHIA WOOLWINE,
INDIVIDUALLY AND AS THE NEXT
FRIEND OF MINOR E.G.W.                         **CLASS ACTION COMPLAINT**
AND ON BEHALF OF ALL OTHERS                    **JURY TRIAL DEMANDED**
SIMILARLY SITUATED,

      **Plaintiffs,**                                 5:21-cv-00418

**v.**

**McKINSEY AND COMPANY, INC.**
**McKINSEY AND COMPANY, INC. UNITED STATES,**
**McKINSEY AND COMPANY, INC., WASHINGTON, D.C.,**

      **Defendants.**

## CLASS ACTION COMPLAINT

**NOW COME** Plaintiffs and Putative Class Representative CYNTHIA WOOLWINE, as the next friend of MINOR E.G.W., individually and on behalf of all others similarly situated nationwide, hereby filing their Complaint against McKinsey & Company, Inc., McKinsey & Company, Inc. United States and McKinsey & Company, Inc., Washington, D.C. for damages, equitable, statutory, and injunctive relief. In support thereof, Plaintiffs state as follows:

## INTRODUCTION

1.    Like thousands of children born every year, minor E.G.W. was born dependent on opioids. Prenatal exposure to opioids injured minor E.G.W. causing severe withdrawal symptoms, and lasting developmental impacts.

2.    Defendants' substantially contributed to minor E.G.W.'s injuries by masterminding an industry-wide conspiracy aimed at increasing their clients' profits through an illegal scheme that fueled the genesis and continuation of minor E.G.W.'s mother's fatal addiction.

3.      The first days of minor E.G.W.'s life was excruciatingly painful and agonizing as doctors weaned the newborn baby from in utero opioid exposure.

4.      Minor E.G.W. will require years of treatment and counseling to deal with the effects of prenatal exposure and its lifelong impact upon E.G.W.'s health, self-esteem, and education and earnings capacity.  Minor E.G.W. is a casualty of the opioid crisis that has ravaged West Virginia due to the tortious conspiracy and negligence of   McKinsey, and the nuisance caused by its wrongful conduct.

5.      Upon information and belief, minor E.G.W.'s mother consumed opioids manufactured or distributed by consultancy clients of the Defendant.

6.      Defendant McKinsey, a preeminent global business consultancy, dispensed advice to Johnson & Johnson, Purdue, Endo, Amerisource Bergen, among others, that drove the Opioid Crisis of which the Plaintiff is a victim, and whose injuries were proximately caused by the acts and omissions of Defendant McKinsey.

7.      Defendant McKinsey provided a wide array of consultancy services to certain manufacturers and distributors working together to alter the standard care for patients experiencing pain which proximately caused injury to the Plaintiff.

8.      Defendant McKinsey skillfully crafted communications and developed campaigns for and on behalf of manufacturers and distributors deliberately intended to deflect and diffuse anti-Opioid messages to benefit manufacturers and distributors, alike, in terms of enhanced  sales and increased profits.  McKinsey is also responsible for exacerbating and fueling both the diversionary-opioid and prescription-opioid markets, and for proximately causing injury to the Plaintiff by reason of the fact that Plaintiff's birth mother became addicted to the products manufactured by McKinsey client Endo and prescribed to her during a time period following

2

dissemination of aforementioned McKinsey-created materials.

9.      Similarly, McKinsey is responsible and liable for   causing injury to the Plaintiff because the Plaintiffs' birth mother, during the first trimester of pregnancy was using J&J, Purdue and Endo products purchased from the diversionary market that was both exacerbated and fueled by the McKinsey's work product.

10.     Defendant McKinsey developed and implemented sales strategies that proximately caused the Plaintiffs' injuries because the doctor who prescribed the Plaintiffs' birth mother the Percocet that began her addiction was targeted by the marketing strategies to be amenable to be persuaded into prescribing the more potent, more profitable, and more addictive products offered by the Defendants' clients.

11.     Defendant McKinsey developed and implemented sales strategies that proximately caused the Plaintiffs' injuries because the Plaintiff's birth mother consumed opioids from the diversionary market that supplied from the high decile doctors targeted by the sales strategies developed by McKinsey.

12.     Defendant McKinsey developed and implemented a marketing strategy that drove the diversionary market which proximately caused the Plaintiffs' injuries by supplying an illegal market that continued to fuel the birth mothers' addiction even after gestation began.

13.     Defendant McKinsey misled the federal government in its report regarding the Opioid Crisis by identifying completely ignoring the prevalence of NAS and instead directing blame to mothers of NAS victims.

14.     Defendant participated in a conspiracy to violate federal and state laws regulating the distribution of opioids.

15.     Plaintiffs bring this class action to seek the equitable relief of medical monitoring

to provide this class of infants the monitoring of developmental issues that will almost inevitably appear as they grow older and equitable relief in the form of funding for services and treatment.

16.     Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

17.     Defendants' wrongful conduct has allowed billions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in West Virginia which in turn contributed to the diversionary market throughout the U.S.  This is characterized as "opioid diversion."  Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant.  As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

18.     For years, Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including the dramatic increase in the number of infants born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic and the exponential increase in the number of infants afflicted with NAS.

19.     Defendants have foreseeably caused damages to minor E.G.W. and Class Members including the costs of neo-natal medical care, additional therapeutic, prescription drug purchases and other treatments for NAS afflicted newborns, and counseling and rehabilitation services after birth and into the future.  Plaintiffs bring this civil action for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the Defendant opioid

drug distributors, retailers, and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured and continues to injure minor E.G.W. and the Class.

## PARTIES

### A.    Plaintiffs

20.    Plaintiff Cynthia Woolwine is a resident of Oceana, Wyoming County, West Virginia.  Plaintiff is the next friend of minor E.G.W.

21.    Plaintiff was prescribed opioid drugs during pregnancy, which lead to NAS Symptoms in minor E.G.W. Plaintiff worked as a medic for two decades. She developed carpal tunnel and compression fractures likely due to patient lifting and was granted disability in 2017. Plaintiff became a patient of Dr. Derakshan in 2003, who prescribed her Lortab and Endocet starting in 2004 in the amounts of "120 Lortabs per month and 180 of Endocet or Percocet". She later moved on to other prescribers such as Dr. Muscari and Dr. Jafary around 2010. Soon, she began buying pills from the street after developing a tolerance to her prescriptions. Around 2 months into her pregnancy with minor E.G.W., Plaintiff was moved to buprenorphine treatment (Suboxone and Subutex) by Dr. Jafary and continues to be on buprenorphine today.

22.    Plaintiff's prescription history includes Nucynta (first prescribed August 2009), Oxycodone (prescribed from February 2010 to July 2010), Endocet (prescribed at various times between 2008 and 2010). Hydrocodone (prescribed September 2008 to Juy 2009, and again August through October 2010), Suboxone (prescribed in November 2010, June 2011 through October 2011, February 2012 through August 2012 (the time of E.G.W.'s birth), and January 2015 through May 2019), and Buprenorphine/Naloxone (prescribed in 2019). Plaintiff received her prescriptions from the Westside Pharmacy (now d/b/a Renegade Pharmacy) in Oceana, WV. Her physicians

5

included Dr. Iraj Derakhshan (September 2008 to July 2010), Dr. Michael Muscari (August 2010 through October 2010), Dr. Hassan Jafary (August 2010 through April 2012), Dr. John Justice (February 2012 through January 2013), and Dr. Ernesto Manuel (January 2013 through 2017).

23.     Minor E.G.W., born November 14, 2012, at Raleigh General Hospital in Beckley, WV, and suffered NAS at birth. Minor E.G.W. was born several weeks premature by emergency C-Section due to low amniotic fluid.  Minor E.G.W. was born with a low birth weight of approximately 4 lbs, 9.3 oz.  Minor E.G.W. experienced many of the known NAS symptoms such as difficulty swallowing, muscle stiffness, and tremors.  Minor E.G.W. had issues with her vision, as well as continued acid reflux problems that cause her to have poor eating and therefore poor weight gain. Now eight years old, she weighs only around 40 pounds.  Minor E.G.W. experienced developmental delays, and continues to struggle with diagnosed ADHD which causes difficulty focusing in school and in social settings.

24.     Minor E.G.W. and Putative Class members are individuals who have suffered Neonatal Abstinence Syndrome as a result of exposure to opioids in utero.  This drug exposure provides minor E.G.W. the right to sue, through her next friend and guardian, for damages under product liability, express warranty, implied warranty of fitness for a particular purpose, implied warranty of merchantability, nuisance, negligence, and gross negligence.

25.     Minor E.G.W. and Putative Class Members directly and foreseeably sustained all damages alleged herein. Categories of past and continuing sustained damages include, inter alia: (1) costs for providing treatment of infants born with opioid-related medical conditions like NAS; (2) equitable relief of medical monitoring, testing and treatment for latent dread diseases associated with NAS (3) costs for providing ongoing medical monitoring care into a Court administered fund, additional therapeutic and prescription drug purchases, and other treatments; (4) costs for

providing treatment, counseling and rehabilitation services; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including foster care services.

26.     Minor E.G.W. and the Putative Class Members have suffered and continue to suffer these damages directly. Plaintiffs and Putative Class Representatives also seek the means to abate the epidemic Defendants' wrongful and/or unlawful conduct has created.

## DEFENDANT

27.     Upon information and belief, McKinsey & Company, Inc.  ("McKinsey & Co.") maintains a principal place of business in New York, New York, and it is incorporated under the laws of the State of Delaware.  During all relevant times, McKinsey & Co. has provided consultancy services to manufacturers and distributors of a wide variety of opioid products, all of whom are complicit and responsible for the shipment of substantial amounts of prescription opioids  into  West Virginia.

28.     Upon information and belief, McKinsey & Company, Inc.- United States ("McKinsey-US") maintains principal place of business in New York, New York, and it is incorporated under the laws of the State of Delaware.  During all relevant times, McKinsey-US has provided consultancy services to manufacturers and distributors, all of whom are complicit and responsible for the shipment of substantial amounts of prescription opioids into West Virginia.

29.     McKinsey & Company, Inc.- District of Columbia ("McKinsey-DC") maintains a principal place of business in New York, New York, and it is incorporated under the laws of the State of Delaware.  During all relevant times, McKinsey-DC has provided consultancy services to manufacturers and distributors, all of whom are complicit and  responsible for the shipment of substantial amounts of prescription opioids  into  West Virginia.

30.     Defendants McKinsey & Co, McKinsey- US and McKinsey-DC will be collectively referred as "McKinsey."

## CO-CONSPIRATORS

31.     Co-Conspirator AmerisourceBergen Corporation, upon information and belief, maintains a principal place of business in Pennsylvania, and it is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has assiduously sought, implemented and compensated McKinsey in connection with its provision of consultancy services leading to the shipment of substantial amounts of prescription opioids to providers and retailers situated in the State of West Virginia.

32.     Co-Conspirator Cephalon, Inc. ("Cephalon"), upon information and belief, maintains a  principal place of business in Frazer, Pennsylvania, and it is organized under the laws of the State of Delaware. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and West Virginia. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."  In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million. Cephalon, Inc. has assiduously sought, implemented, and compensated  McKinsey in connection with its provision of consultancy services leading to  substantial amounts of prescription opioids to providers and retailers in the State of West Virginia.

33.     Co-Conspirator Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is, upon information and belief, an Israeli corporation with its principal place of business in Petah Tikva, Israel.  Related entity Teva Pharmaceuticals USA, Inc. ("Teva USA") is, upon information and

belief, a wholly- owned subsidiary of Teva Ltd., and it is a Delaware corporation with its principal place of business in Pennsylvania.  Teva USA acquired Cephalon in October 2011. Teva derived direct and indirect pecuniary benefit from McKinsey's professional advice and consultancy services that Cephalon sought,  implemented and paid for; the objective was  to make more money from the  inordinate —unconscionable-- amounts of prescription opioids being distributed to providers and retailers operating within the State of West Virginia.

34.     Together, co-Conspirators Teva Ltd., Teva USA, Cephalon, and McKinsey collaborated and colluded to market and sell Cephalon products in the United States.

35.     Teva Ltd. is the entity responsible for s all of Cephalon's sales and marketing activities within the United States, through related entity Teva USA.  Teva Ltd. and Teva USA publicize and promote Actiq and Fentora as being Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide (the Guide"), which is distributed with Cephalon opioids marketed and sold in West Virginia, discloses that the Guide was submitted by Teva USA, and it explicitly directs physicians to contact Teva USA to report adverse events.

36.     Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed throughout West Virginia, certifying that  Teva Ltd. would be responsible for covering certain described co-pay costs.  All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo.

37.     Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own; all financials are consolidated.  Through interrelated corporate structures, Teva Ltd. operates in West Virginia and the rest of the United States. through its two subsidiaries Cephalon and Teva USA.

The United States. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015; significantly,   were it not for the existence of subsidiaries Teva USA and Cephalon, Inc., Teva Ltd. would be constrained to conduct its business operations from West Virginia only. Upon information and belief, Teva Ltd. directs and controls the business practices of Cephalon and Teva USA, and the profits of these two subsidiaries directly and exclusively inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. Are sometimes hereinafter collectively referred to as "Cephalon.")

38.     Co-Conspirator Janssen Pharmaceuticals, Inc. ("Janssen"), upon information and belief, a Pennsylvania corporation that maintains a principal place of business in Titusville, New Jersey.

39.     Janssen is a wholly owned subsidiary of Johnson & Johnson ("J&J").

40.     J&J is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

41.     Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen, is a Pennsylvania corporation with its principal place of business, like Janssen, located in Titusville, New Jersey.

42.     J&J is the only company that owns more than 10% of Janssen's stock, and J&J (not Janssen) corresponds with the FDA regarding Janssen's products.

43.     Upon information and belief, J&J controls the sale and development of Janssen's drugs and Janssen's profits inure directly and exclusively to J&J's benefit.   (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are sometimes collectively referred to as "Janssen.").

44.     Janssen manufactures, promotes, sells, and distributes drugs including but not

limited to the opioid Duragesic, in the United States, including West Virginia. Before 2009, Duragesic accounted for at least $1 billion in annual sales.

45.     Until January 2015, Janssen developed, marketed, and sold opioids under the names Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

46.     Co-Conspirator Endo Health Solutions Inc. ("Endo Health") is, upon information and belief, a Delaware corporation that maintains a principal place of business in Malvern, Pennsylvania.  Endo Pharmaceuticals Inc. ("Endo Pharma") is, upon information and belief, a Delaware corporation that maintains a principal place of business in Malvern, Pennsylvania, and Endo Pharma is a wholly- owned subsidiary of Endo Health,. and (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are sometimes collectively referred to as "Endo.").

47.      Endo develops, markets, and sells prescription drugs, including the opioids under the names Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including West Virginia.  Opioids account for nearly $403 million of Endo's overall revenues of $3 billion in 2012.  Opana ER accounted for $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012.

48.     Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products throughout the United States, including West Virginia, either by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

49.     Co-Conspirator J&J either was at relevant times or currently owner and operator of wholly owned subsidiaries Janssen, Noramco, Inc. and Tasmanian Alkaloids,

50.     J&J sought out, implemented, and paid for McKinsey's the professional advice and consultancy services, for purposes of  making more money and profits from the shipment of

opioids to West Virginia, in addition to cultivating and exploiting and, thereby, monetizing J&J's world-wide narcotics franchise. J&J is liable for conspiring with McKinsey, Purdue, Endo, Cephalon and Amerisource Bergen.

51.     Cephalon, Janssen, Endo, J&J, Teva and McKinsey are collectively referred to hereinafter as the "Co-Conspirators".

## JURISDICTION AND VENUE

52.     Jurisdiction of this Court arises under 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees and costs.

53.     This Court is also vested with jurisdiction by virtue of the Class Action Fairness Act, 28 U.S.C. § 1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, citizens of the State of West Virginia, and Defendants.  The proposed class exceeds 100 persons. Further, the amount in controversy exceeds $5,000,000.00.

54.     Defendants have, alone and in combination, systematically, individually, jointly, and severally engaged in conduct and activities over a period of years in West Virginia and are the proximate  cause of all of the damages sustained by Plaintiffs, minor E.G.W. and the Class, all of which form the bases of the causes of action in this Complaint as against Defendants.  Defendants have committed multiple torts and breaches within the State of West Virginia, repeatedly and systematically.

55.     Defendants, for a long time, repeatedly and systematically, have substantial contacts and business relationships within West Virginia and its patients and citizens, including consensual relationships and contracts performed within West Virginia, some or all of which form the basis of the causes of action in this Complaint as against Defendants.

12

56.     This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or in whole, within the State of West Virginia, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly within West Virginia by virtue of their actions and commissions in connection with distribution, dispensing, and marketing and sales, of prescription opioids.  All causes of action herein relate to Defendants' wrongful actions, conduct, commissions, and omissions committed against Plaintiffs, minor E.G.W. and the Class, and the consequences and damages related to said wrongful actions, conduct, and omissions.

57.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims occurred in the Southern District of West Virginia.

## FACTUAL ALLEGATIONS OF DEFENDANTS' CONSPIRATORIAL CONDUCT

58.     Beginning in the mid-1990s, opioid manufacturers pursued aggressive sales strategies to increase sales of their prescription opioids, a plan that resulted in a dramatic rise in opioid prescriptions in West Virginia. The rise in opioid prescriptions caused an equally devastating rise in opioid use disorder, dependence, addiction, and overdose deaths; as well as a dramatic increase in instances of Neonatal Abstinence Syndrome ("NAS"), in which children born to opioid addicted mothers suffer both acute and long-lasting physical, psychological, and developmental injury.

59.     Children born with NAS suffer the effects of the opioid epidemic from the moment of birth, experiencing acute withdrawals and a higher risk of birth defects immediately. As these children with NAS age, they will experience significant behavioral, developmental, and psychological symptoms on their way to adulthood. These children will require long-term care.

60.     Prescription opioids continue to kill hundreds of people across West Virginia

every year. Thousands more suffer from negative health consequences short of death and countless others have had their lives ruined by a friend or family member's addiction or death.   Every community in West Virginia suffers from the opioid crisis of addiction and death.  Thousands more babies are born with NAS in West Virginia every year as the Opioid Crisis continue unabated.  Every community in West Virginia carries the burden of caring for, educating, and raising the vast number of children born with NAS in the state each year.

61.     West Virginia has one of the highest incidences of NAS Births in the nation. According to statistics from the West Virginia Department of Health and Human Resources ("WVDHHR"), West Virginia recorded 50.6 NAS births per 1,000 babies born in the state in 2016-2018 alone. Intrauterine drug exposure rates, the underlying cause of NAS, are even higher in West Virginia, recorded at 143 instances per 1,000 births according to WVDHHR statistics.

62.     These alarming numbers of NAS births in West Virginia could not have been possible without McKinsey's advice to Purdue and co-conspirators. According to the DEA ARCOS database ("ARCOS Data"), which tracks shipments of all opioid drugs from labelers and distributors to pharmacies on a national basis, between 2006 and 2012, the number of opioid drugs in West Virginia surged to unprecedented levels as McKinsey's advice was put into practice first by Purdue, and later co-conspirators. According to this data, the number of Purdue opioids shipped to West Virginia during these years amounted to 952,781,390 milligrams of morphine equivalent ("MME"), or 16,919,660 individual pills or "total dosage units" ("TDU").  When divided by population, this equals to 515mg of morphine equivalent for each man, woman, and child in West Virginia.

63.     As McKinsey emulated Purdue's success in advice to Co-Conspirators, these companies similarly experienced wild profits in West Virginia as prescriptions and demand for

their opioid drugs increased. According to ARCOS data, between 2006 and 2012, co-conspirators sent shockingly large amounts of powerful opioid drugs to pharmacies in West Virginia. During this time frame Janssen Pharmaceuticals shipped 328,373,951 MME or TDU; Endo shipped 229,710,534 MME or 8,453,120 TDU; Teva shipped 196,953,618 MME or 11,679,117 TDU; and Cephalon shipped 662,272 MME or 8,776 TDU to pharmacies, and ultimately, the citizens of West Virginia. The proliferation of opioids around the state and the profits of McKinsey and co-conspirators correlates directly with the increase in children born in West Virginia with NAS.

64.    McKinsey diligently advised entities involved with the manufacturing and sale of opioids on how to maximize profits by generating the maximum number of prescriptions for opioid drugs, thereby contributing to the opioid crisis and high rates of children born with NAS in West Virginia.

65.    McKinsey is one of the world's largest consulting companies. Its partners work worldwide for corporations and governments across diverse industries. Its influence is vast because of its "best-in-class" reputation. McKinsey sells the notion that it can take whatever a company or government is doing and make them do it better.

66.    Class members bring this action against McKinsey for the consulting services it provided to opioid companies in connection with designing the companies' marketing plans and programs that helped cause and contributed to the opioid crisis. McKinsey sold its ideas to OxyContin maker Purdue Pharma, L.P. ("Purdue") for more than fifteen years, from 2004 to 2019, including before and after Purdue's 2007 guilty plea for felony misbranding.

67.    McKinsey advised Purdue and other manufacturers to target prescribers who write the most prescriptions, for the most patients, and thereby make the most money for McKinsey's clients.

## MCKINSEY'S ADVICE SPURS OPIOID PRESCRIPTION DEMAND

68.     McKinsey's advice to co-conspirators allowed the opioid crisis to worsen to its current level. McKinsey advised co-conspirators to do whatever it took to proliferate opioid prescriptions in order to maximize their profits, regardless of the cost to the public. Notably, McKinsey's strategy of targeting the highest prescribing physicians proved so successful that sales of Purdue's opioid drugs surged, as did demand for opioid drugs in general.  McKinsey replicated this strategy in advice to the co-conspirators, who similarly experienced an uptick in sales.  With this, West Virginia saw an even larger surge in opioid addiction, overdose deaths, and instances of children born with NAS.

69.     Class members have identified a multitude of documents indicating that on McKinsey's advice, Purdue's sales force engaged in targeted high prescribing physicians in an effort to increase opioid prescription volume. Ranked lists of all Purdue-branded opioid prescribing physicians known to Purdue (the "Physicians Universe" list), lists of physicians ranked by prescription writing volume of Purdue branded Drugs, and more highly targeted lists designated as "Cores" and "Super Cores", listing the most prolific opioid prescribers in the country, were disseminated monthly to Purdue sales teams around the country. The "Physician Universe" list, for example, was divided into columns organizing physicians by value to Purdue's bottom line, with columns listing doctors' "Total Portfolio Value", "Oxycontin Value Ranking" and "Butrans Value Ranking". In emails to sales staff, rules governing contact and frequency of sales visits to these physicians, as well as goals for prescription volume were set forth. The sales teams were encouraged to place multiple calls per month to the highest decile providers in their territories, in attempts to increase the number of opioid scripts written, and perversely incentivized by bonuses which correlated directly with these numbers.

70.     For doctors listed as "Very High Potential" opioid prescribers in the "Super Core" lists, Purdue ordered its sales team to make visits to these doctors every week. An additional, top-secret Purdue physician list code named "Region Zero" listed the exact prescriptions, units, dosages, and dollars of revenue generated by doctors whom Purdue themselves had identified as being likely involved in opioid misuse and diversion. Purdue directed its sales representatives to avoid doctors on this list, while neglecting to inform physicians they had been placed on the list. Purdue directed its sales representatives to avoid doctors on this list, while neglecting to inform physicians they had been placed on the list. Company executives told the Los Angeles Times in a 2013 interview that Purdue had reported about 8% of the doctors on the "Region Zero" list to authorities.[1]

71.     The doctors who prescribed Plaintiff opioid drugs appeared on these physician targeting lists compiled by Purdue. Dr. Hasan "Nick" Jafary, who was Plaintiff's doctor at the time of her pregnancy with E.G.W., is flagged by Purdue in these lists as an Oxycontin and Butrans "Super Core" target, with a total prescription market potential designation of "high". A 2013 healthcare provider target list indicates that Purdue called Dr. Jafary often multiple times per month during Ms. Woolwine's pregnancy with child E.G.W.'s birth. Dr. Michael Muscari, who prescribed Plaintiff Hydrocodone with Acetaminophin tablets in 2010, prior to her pregnancy, is similarly designated as a "high" total prescription market potential prescriber in Purdue's "Super Core" physician lists.  Dr. Iraj Derakhshan, who prescribed plaintiff the opioids Endocet and Hydrocodone with Acetaminophen tablets between 2008 and 2009, Nucynta in 2009, and Oxycodone in 2010, prior to her pregnancy with child E.G.W., is identified in Purdue's physician

---

[1] *See* "OxyContin maker closely guards its list of suspect doctors", Los Angeles Times, published August 11, 2013. https://www.latimes.com/local/la-me-rx-purdue-20130811-story.html.

targeting lists as a "Region Zero" prescriber, which is Purdue's internal nomenclature for its roster of physicians suspected of recklessly prescribing to addicts or dealers.

72.    Beginning as early as 2004, and continuing for over a decade, McKinsey advised Purdue and other pharmaceutical companies (including Johnson & Johnson, Endo, and Cephalon) on how to increase prescriptions and sales of their opioid drugs.

73.    McKinsey's initial advice revolved around competitors working together in leveraging the promotion of changes in the standard of care to drive demand for the Opioid Industry as a whole. That advice clearly was a success.

74.    Early in their relationship, McKinsey advised Purdue that it could increase OxyContin sales through physician targeting and specific messaging to prescribers. These McKinsey strategies formed the pillars of Purdue's sales tactics for the next fifteen years.

75.    In 2008, McKinsey worked with Purdue to develop its FDA mandated risk evaluation and mitigation strategy ("REMS"). McKinsey advised Purdue to "band together" with other opioid manufacturers toward a class REMS to "formulate arguments to defend against strict treatment by the FDA." Ultimately, the FDA adopted a class-wide REMS that resulted in high-dose OxyContin remaining subject to the same oversight as lower-dose opioids.

76.    In 2009, Purdue hired McKinsey to increase "brand loyalty" to OxyContin. McKinsey recommended the best ways to ensure loyalty to the brand by targeting specific patients, including patients new to opioids, and developing targeted messaging for specific prescribers.

77.    Purdue thereafter adopted McKinsey's proposed prescriber messaging and patient targeting advice and incorporated them into Purdue's marketing and sales strategies.

78.    In 2013, McKinsey conducted another analysis of OxyContin growth opportunities for Purdue and laid out new plans to increase sales of OxyContin. Among the key components of

McKinsey's plan adopted by Purdue were to:

    **a.**    focus sales calls on high-volume opioid prescribers, including those who wrote as many as 25 times as many OxyContin scripts as their lower volume counterparts;

    **a.**    Remove sales representative discretion in targeting prescribers;

    **b.**    Focus Purdue's marketing message to titrate to higher, more lucrative dosages;

    **c.**    Significantly increase the number of sales visits to high volume prescribers; and

    **d.**    Create an "alternative model for how patients receive Oxycontin" including direct to patients and pharmacies, to help address the "product access" problem.

79.    Purdue approved McKinsey's plan, and together with McKinsey, moved to implement the plan to "Turbocharg[e] Purdue's Sales Engine," under the name Evolve 2 Excellence ("E2E"). E2E significantly increased Purdue's opioid sales, in particular, for OxyContin.

80.    McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive Committee, the Purdue board, and with the Sacklers, individually. McKinsey worked side by side with Purdue and helped Purdue plan and implement E2E, assisting with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting.

81.    In developing the targeted messaging to increase sales of OxyContin, McKinsey conducted significant market research, including through "ride-alongs" with Purdue sales representatives to learn how they promoted OxyContin. McKinsey carefully monitored Purdue sales representatives and provided guidance on prescriber messaging and adhering to target prescriber lists. McKinsey advised that sales representatives do more to promote the so-called abuse deterrent properties of a reformulated version of OxyContin to address prescriber concerns about abuse risk.

82.     When a large pharmacy chain took steps to scrutinize suspicious opioid orders, McKinsey stressed to Purdue's owners the "need to take action" on this "urgent" issue affecting OxyContin. McKinsey told Purdue's owners to engage in senior level discussions with the pharmacy chain, increase efforts with patient advocacy groups to clamor against dispensing limits, and accelerate considerations of an alternative distribution channel, such as delivering OxyContin directly to patients through mail-order pharmacies.

83.     After E2E, McKinsey continued to work with Purdue, including on a project that identified the growing addiction crisis as a profit-making opportunity. McKinsey told Purdue that it should strive to become a provider across the spectrum of drug abuse and addiction because of the opportunities it presented. McKinsey advised Purdue to get into the manufacturing and marketing of opioid rescue and treatment medications in order to profit from the realities of dependence, addiction, and misuse. Indeed, in 2018, Purdue owner Dr. Richard Sackler received a patent for a drug to treat opioid addiction.

84.     McKinsey also partnered with Purdue to test a program called FieldGuide, a proprietary software that McKinsey sought to license to other manufacturers. This software would enable other opioid manufacturers to target and aggressively pursue high-volume prescribers.

85.     McKinsey continued to design and develop ways that Purdue could increase sales of OxyContin well after the opioid epidemic peaked. One proposal McKinsey recommended was for Purdue pay "additional rebates on any new OxyContin related overdose or opioid use disorder diagnosis." McKinsey advised Purdue on its strategies to obtain and maintain broad formulary coverage for OxyContin with insurers and pharmacy benefit managers, even as payors began reducing coverage for OxyContin as the opioid crisis mounted.

86.     Subsequently, in the wake of hundreds of thousands of opioid deaths and thousands

of lawsuits, McKinsey proposed a plan for Purdue's exit from the opioid business whereby Purdue would continue selling opioids as a way to fund new Purdue ventures. According to McKinsey, this change was necessary because of the negative events that materially compromised the Purdue brand.

87.    McKinsey's work for opioid manufacturers extended beyond Purdue. McKinsey designed and implemented marketing programs for the country's largest opioid manufacturers and distributors, including Johnson and Johnson, Cephalon, and Endo collecting millions of dollars in fees and, further increasing the sale and use of opioids, and thereby instances of children born suffering from NAS, in West Virginia.

88.    At the same time McKinsey was working for opioid companies, McKinsey also consulted with governments and non-profits working to abate the raging opioid crisis—a crisis that McKinsey's own research showed was caused in large part by prescription opioids.

89.    There are indications that individuals at McKinsey considered destroying or deleting documents related to their work for Purdue.

90.    In 2019, McKinsey announced that it no longer worked for Purdue or other opioid manufacturers. But the harm created by McKinsey's marketing plans for opioid manufacturers has not stopped.

91.    Opioids have killed thousands in West Virginia, and continue to ravage the lives of many more, creating one of the largest public health epidemics in the country's history. The astounding rates of children born with NAS in West Virginia represents a parallel epidemic unfolding concurrently with the opioid crisis as a whole, one that will have lasting for decades into the future as these children grow into adults. Economically, the toll is equally grim. The opioid crisis has already forced West Virginia to pay millions of dollars for increased costs in health care,

criminal justice, and many other programs needed to abate the epidemic. The crisis of widespread NAS in West Virginia will similarly require billions of dollars in child welfare, education, and health care costs soon.

92.      Months after McKinsey stopped its opioid work, Purdue filed for bankruptcy. More than a hundred thousand individuals filed claims for personal injuries. States and local governments filed claims for trillions of dollars incurred as a result of the opioid crisis. Another McKinsey client, opioid manufacturer Mallinckrodt plc, similarly filed for bankruptcy protection in October 2020.

93.      In 2019, an Oklahoma state court found that McKinsey client Johnson & Johnson helped cause the opioid epidemic in Oklahoma, ordering it to pay $465 million to help abate the crisis.

94.      In 2020, Purdue pleaded guilty to three felonies as a result of conduct spanning a decade – from 2007 to 2017 – during which Purdue worked side-by-side with McKinsey to design and implement marketing campaigns to increase dangerous opioid sales.

95.      In 2020, Purdue and the members of the Sackler family who owned Purdue also settled civil claims by the Department of Justice for hundreds of millions of dollars. The materials filed in connection with that plea and settlement agreements contain a statement of facts regarding McKinsey's conduct and involvement in the conduct leading to the civil claims against Purdue and the Sackler family.

## McKINSEY'S ADVICE DRIVES OPIOD DIVERSION SUPPLY

96.      By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was

advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their novel opioid product, the Duragesic fentanyl patch. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were already prescribing large amounts of Purdue's OxyContin.

97.     As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to Purdue's competitors in the opioid market that they boost their own opioid sales by following in the footsteps of Purdue.

98.     McKinsey was aware that their advice to the pharmaceutical industry was contributing to opioid abuse and diversion. In 2013, McKinsey briefed Purdue on the ongoing concerns of oxycontin addiction and diversion among prescribers, advising Purdue's marketing and sales teams on how to tailor their messaging to doctors who were growing increasingly wary of prescribing such drugs.

99.     Despite this awareness, McKinsey's mandate was to increase opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the overprescribing of opioids and the inevitable consequences thereof. McKinsey's job was to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth and the growth of other opioid manufacturers continued its upward trajectory unabated, as national overdose deaths and NAS Births also increased.

100.     Perhaps the key insight McKinsey provided to opioid manufacturers was, using its granular approach, to identify historically large prescribers and target ever more sales and

marketing resources on them. After seeing much success with this technique in their consulting for Purdue, McKinsey similarly advised opioid manufacturers Johnson & Johnson and Endo to target high prescribing doctors with sales teams to increase opioid prescriptions, as well as prescriptions of higher and more potent dosages.

101.     On January 20, 2010, Purdue's board was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those high prescribing doctors with a marketing blitz to encourage even further prescribing of their Opioid drugs. Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

102.     By all accounts, McKinsey's strategy of physician targeting was a success, and the same techniques honed through their work with Purdue were given to Purdue's competitors. Opioid prescriptions in West Virginia increased exponentially in this period. McKinsey's advice to Purdue, J&J, Endo, and Cephalon to target top-decile contributors drove not only demand for prescriptions but also supply into the diversionary market.

103.     In West Virginia, the number of prescriptions written and the number of opioid drugs dispensed during this time period is staggering: between 2008 and 2018, 2.6 million opioid pills were dispensed from  the Tug Valley Pharmacy  in Williamson, WV (Population 2800 individuals), and 3.7 million hydrocodone pills were dispensed from a pharmacy in the tiny town of Kermit, WV, with a population of only 400 individuals, during this same time period.  Westside Pharmacy in Oceana, WV (Pop. 1,394), where Plaintiff filled her prescriptions, sold 7,939,772

opioid pills between 2006 and 2014, according to DEA tracking data.

104.    The amount of opioids in West Virginia during this time period is so vastly more than small communities such as Oceana could even consume for medical purposes, that it is all but guaranteed many of these pills entered the diversionary market, further increasing the severity of the opioid epidemic and the number of instances of NAS in West Virginia. This would not have been possible without McKinsey's advice to the pharmaceutical industry on how to sell the maximum number of opioids possible.

## McKINSEY'S ADVICE PROTECTS DISTRIBUTORS WHO PLED GUILTY

105.    McKinsey's advice to AmeriSource Bergen to re-direct criticism onto the addict population allowed AmeriSource Bergen to continue to distribute substantial amounts of pain pills in to West Virginia.

## McKINSEY MISLEADS THE FEDERAL GOVERNMENT ABOUT THE IMPACT OF OPIOID DRUGS ON CHILDREN

106.    McKinsey misled the federal government as to the impact of the Opioid Crisis on children by only presenting the talking points McKinsey created for its co-conspirators, which sought to redirect blame for the Opioid Crisis onto patients that abuse the drug.

In the 2016 report, McKinsey acknowledged that the Opioid Crisis harmed children but only to the extent that children were being raised in difficult home circumstances due to their parent's status as drug addicts. By deciding to hide hundreds of thousands of injured babies from the federal government, McKinsey directly harmed each of the NAS Children in lost opportunities for federal attention to the problem, as well as lost opportunities in mitigation of the problem for children born after 2016.

107.    McKinsey, with its extensive research capacity, must have known of the extent of the NAS epidemic and therefore must have decided to exclude any mention of hundreds of thousands of children directly harmed by its clients' products.

108.    Below are relevant facts of which McKinsey was most certainly aware that should have garnered attention in McKinsey's report:

a.    The incidence of NAS has been increasing in the United States. The Substance Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin) in 2011.[2]

b.    In recent years, there has been a dramatic rise in the proportion of infants who have been exposed to opioids. Opioid use among women who gave birth increased in the United States from 1.19 to 5.63 per 1,000 hospital births per year between 2000 and 2009. Concurrently the incidence of neonatal abstinence syndrome (NAS) among newborns during the same period (from 1.20 per 1,000 hospital births per year in 2000 to 3.39 per 1,000 hospital births per year in 2009).[3]

c.    In a study from Florida, the number of newborns who had NAS and were admitted to the NICU increased by 10-fold from 2005 to 2011, a relevant period when Defendant McKinsey tortiously and negligently conspired with others to drive supply to the diversionary market. Increases in the incidence of NAS have been reported uniformly across community hospitals, teaching hospitals, and children's hospital.[5]

d.    The incidence of NAS in newborns born to opioid-dependent women is between 70 and 95 percent. Research suggests that newborns with NAS (most commonly associated with opioid misuse during pregnancy) are more likely than all other hospital births to have low birthweight or respiratory complications. Untreated heroin and other opioid misuse during pregnancy also is associated with increased risk of placental abruption, preterm labor, maternal obstetric complications, and fetal death.[6]

---

[2] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

[3] Patrick, S. W., Schumacher, R. E., Benneyworth, B. D., Krans, E. E., McAllister, J. M., & Davis, M. M. (2012). Neonatal abstinence syndrome and associated health care expenditures: West Virginias, 2000–2009. *Journal of the American Medical Association, 307*(18), 1934–1940.

[5] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

[6] Winklbaur, B., Kopf, N., Ebner, N., Jung, E., Thau, K., & Fischer, G. (2008). Treating pregnant women dependent on opioids is not the same as treating pregnancy and opioid dependence. Addiction, 103(9), 1429–1440; *see also* American College of Obstetricians and Gynecologists. (2012; reaffirmed in 2014). Opioid abuse, dependence, and addiction in pregnancy (Committee Opinion No. 524). Retrieved from http://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co524.pdf?dmc=1&ts=20150928T1302076021; *see*

109.    The NAS epidemic and its consequences could have been, and should have been, prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids.  These Defendants have profited greatly by allowing West Virginia to become flooded with prescription opioids.

110.    The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients.  Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs seek to represent the following class of individuals:

> *All persons born in West Virginia under the age of eighteen, born after 2002 who were diagnosed with opioid withdrawal and whose birth mother (1) used opioids during gestation. and (2) had a medical prescription for opioids before or during the gestation period.*

Excluded from the Class are children of the Defendants and their officers, directors, and employees, as well as the Court and its personnel.

112.    Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure for the following reasons:

113.    The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met.

      a.    The class is so numerous that joinder of all persons is impracticable. Although the

---

*also* Kaltenbach, K., Berghella, V., & Finnegan, L. (1998). Opioid dependence during pregnancy: Effects and management. Obstetrics Gynecology Clinics of North America, 25(1), 139–151.

precise number of children in the Class is currently unknown, Plaintiffs believe that the putative class is in the thousands, if not more.

b.   There are common issues of law and fact, particularly whether Defendants' and their agents' policies and procedures that encouraged the continued use and abuse of opioids despite knowing the dangers caused harm to the Class.

c.   Plaintiffs' claims are typical of the class.  Plaintiffs' injuries are typical of the experience of the Class Members, having suffered personal injury and increased health risks necessitating medical monitoring and future medical treatment that are typical of the experience of the Class Members.  Plaintiffs' interests are identical to and aligned with those of other Class Members.  Plaintiffs and the Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to exposure to Defendants' manufacture and distribution of opioids.

d.   Plaintiffs will fairly and adequately represent and protect the interests of the class because:

i.   Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

ii.   Plaintiffs and counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

iii.   Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will be protected; and

iv.   Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

v.   Plaintiffs and counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

vi.   Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will be protected; and

vii.  Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

Further, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

114.    Defendants' conduct presents predominant common factual questions. This class is bound together by the common factual questions relating to whether the Defendants' tortious activities led to physicians' over-subscription of opioids and created a diversionary market for opioids thus certification is proper under Rule 23 (c)(4).  Regardless of whether Plaintiffs and the Class Members are presenting individualized damages such as pain & suffering, they will present common liability proof that is the same for each member of the Class.  Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

115.    The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions.  The amounts of economic and non-economic losses can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies set forth in the Federal Manual for Complex Litigation with the assistance of court-appointed personnel, including Special Masters.  Certain types or elements of damage explained below as appropriate under Federal Rule of Civil Procedure 23(b)(2) are subject to proof using aggregate damage methodologies or simply rote calculation and summation on a class-wide basis while individual damages may be determined via the mechanisms explained above.

116.     A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct.  A class action allows the Court to process all rightful claims in one proceeding.  Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery.  The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

117.     The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

118.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

119.     The particular common issues of liability, fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are questions of common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

120.     The particular common issues of fact common to all class members no matter what type of harm or injury was suffered by each class member include: the specific nature of the defendants' advice to co-conspirators, the co-conspirators reliance upon the

specific advice rendered by the defendant, the Defendants knowledge of the harm proximately caused by the Defendants' advice and the financial benefits derived by the Defendants from the conduct alleged herein.

121.    A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate the entry of equitable and/or injunctive relief, including a medical monitoring protocol and treatment programs, and injunctive relief to prevent recurrence of the conduct in the future.

122.    As a result of Defendants' negligent conduct, the Rule 23(b)(2) Class Members are at increased risk of NAS and developmental issues. Early detection of neonatal exposure and developmental issues through examination and testing, with treatment as necessary, has significant value for Rule 23(b)(2) Class Members because such detection will help Class Members monitor, minimize and treat the harm therefrom. Due to neonatal opioid exposure by the Rule 23(b)(2) Class Members, surveillance, surveillance in the form of periodic medical examinations and treatment is reasonable and necessary, because such surveillance will provide early detection, diagnosis and treatment of NAS and its effects. As a remedy for the negligent and unconscionable conduct alleged in this Complaint, Defendants should be required to fund a medical monitoring and treatment program designed to identify and combat NAS and its effects on the Class and provide desperately needed neonatal care and treatment programs as NAS affected children develop.

123.    The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

124.    The particular factual issues presented herein are common to all class members no

matter what type of harm or injury was suffered by each Class Member.

## CAUSES OF ACTION

### <u>COUNT I - CIVIL CONSPIRACY</u>

125.     Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

126.   Defendants conspired with the Co-Conspirators by taking steps to advise, inform and enable them to engage in tortious activity that proximately caused the injuries alleged herein.

127.   By garnering information from each Co-Conspirator, the Defendants placed themselves in a position by which Defendants' knowledge of each Co-Conspirators' trade secrets and market performance allowed the Co-Conspirators to act in concert to tortiously and illegally change the standard of care for opioids, drive an oversupply in the prescription market to meet the demands of the diversionary market, deflect criticism/enforcement actions against the co-conspirators and mislead the federal government about nature of the harm to children caused by the Opioid Crisis.

128.   No Defendant or co-conspirator in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

129.   Each Defendant and co-conspirator likewise benefitted from this conspiracy in that the more pervasive opioid diversion became, the more Defendant and Co-Conspirators profited.

130.   As a result of the concerted actions between and among the Defendants, the

Plaintiffs and the class have suffered damages.

131.   Defendants are jointly and severally liable for the damages inflicted by themselves and all Co-Conspirators.

132.   Plaintiffs, minor E.G.W. and the Class demand judgment against each Defendant for compensatory damages.

## COUNT II - NUISANCE

133.   Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

134.   The nuisance is the over-saturation of opioids in West Virginia for non-medical purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use, including the increasing incidence of NAS.

135.   All Defendants substantially participated in nuisance-causing activities.

136.   Defendants' nuisance-causing activities include selling or facilitating the excessive sale of prescription opioids to the patients and citizens of West Virginia, as well as to unintended users, including newborns and children, people at risk of overdose, and criminals.

137.   Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

138.   Defendants' activities unreasonably interfere with the rights of Plaintiffs and the Class.

139.   The Defendants' interference with these rights of Plaintiffs and the Class is

unreasonable because it:

      a.    Has harmed and will continue to harm the children and public health services of West Virginia;

      b.    Is proscribed by statutes and regulation, including the CSA and the consumer protection statute;

      c.    Is of a continuing nature and it has produced long-lasting effects; and

      d.    Defendants have reason to know their conduct has a significant effect upon Plaintiffs and the Class.

140.    The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities.

141.    The resources of the communities of the Plaintiffs and the Class are insufficient to deal with needs created by the Opioid Crisis, and these limited resources are being unreasonably consumed in efforts to address the Crisis, including efforts to address the overwhelming number of children born with NAS.

142.    Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior.  In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in failing to identify, halt, and report suspicious opioid transactions. There is no legitimate societal interest in Manufacturer Defendants dissemination of false "scientific" facts and advice.

143.    Plaintiff minor E.G.W. and the Class also have suffered unique harms different from the public at large, namely, that they personally suffer NAS.

144.    The effects of the nuisance can be abated. Defendants share in the responsibility for doing so.

145.    Defendants should be required to pay for medical monitoring expenses Plaintiffs and the Class will incur in the future to fully abate the nuisance.

### COUNT III - NEGLIGENCE AND GROSS NEGLIGENCE

146.     Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

147.     Defendants owe a non-delegable duty to Plaintiffs, minor E.G.W. and the Class to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

148.     There is no social value to Defendants' challenged behavior.  In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

149.     On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of minor E.G.W. and the Class and its patients.

150.     Defendants' behavior caused a substantial injury and damage to minor E.G.W. and the Class.

151.     Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

   a.  Assisting the Co-Conspirators in consciously supplying the U.S. market with highly addictive prescription opioids, including misrepresenting, understating, or obfuscating the highly addictive propensities of opioid pills;

   b.  Assisting the Co-Conspirators in using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

   c.  Assisting the Co-Conspirators in affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

   d.  Assisting the Co-Conspirators in training their employees to encourage prescriptions likely to lead to diversionary market oversupply;

e.   Failing to provide advise to the Co-Conspirators that would encourage effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

f.   Assisting the Co-Conspirators in creating misleading information with the intention of having prescribing physicians rely upon it.

152.   Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the providing advice, consultation, and management service to the Co-Conspirators.

153.   Defendants were also negligent or reckless in failing to advise the Co-Conspirators to guard against foreseeable third-party misconduct, *e.g.*, the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

154.   Plaintiffs, minor E.G.W. and the Class are without fault, and the injuries to Plaintiffs, minor E.G.W. and the Class would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

155.   The aforementioned conduct of Defendants proximately caused damage to Plaintiffs, minor E.G.W. and the Class.

### COUNT IV - MEDICAL MONITORING

156.   Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

157.   Plaintiffs assert a claim for Medical Monitoring under the Laws of State of West Virginia seeking appropriate injunctive and equitable relief.

158.   By definition, plaintiff minor E.G.W. was exposed to opioids, a known toxic

substance, at a concentration higher than expected for the general population. Such exposure was proximately caused by the tortious activities of the Defendants.

159.    Minor E.G.W. and those similarly situated face a lifetime of latent, dread medical and emotional conditions proven to be linked to in utero exposure opioids including but not limited to: brain damage, muscular-skeletal developmental disorders, speech and language disorders, cognitive developmental disorders, psychiatric disorders, emotional development disorders, behavioral disorders and increased risk of addiction.

160.    Minor E.G.W. and those similarly situated will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

161.    Minor E.G.W. and those similarly situated will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results[7] so that other heretofore unrecognized latent, dread diseases that may be associated with in utero exposure may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

162.    Further, minor E.G.W. and those similarly situated will require on-going care for the aforementioned conditions which are known to result from in utero exposure to opioids including but not limited to medical care, psychiatric care, psychological care, physical therapy, cognitive therapy and speech therapy.

163.    The harm visited upon minor E.G.W. and those similarly situated is irreparable.

---

[7] Such epidemiological data will be collected, maintained and analyzed in such a manner as to protect the identity of individual class members.

164.    Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

165.    Further, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

166.    Minor E.G.W., on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the class.

167.    Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Cynthia Woolwine, individually and on behalf of minor E.G.W. and all those similarly situated requests that the Court grant the following relief:

a.    Injunctive and Equitable Relief Medical Monitoring of the Class;

c.    Attorneys' fees and costs;

d.    Pre and Post Judgment Interest;

d.    All such other relief this Court deems just and fair; and

f.    Plaintiffs seek a trial by jury for all counts so triable.

Date: <u>July 23, 2021</u>

Respectfully submitted by:

<u>/s/ Stephen P. New</u>
Stephen P. New (W.Va. Bar No. #7756)
New, Taylor and Associates
430 Harper Park Dr.
Beckley, WV 25801
304-250-6017
304-250-6012 (facsimile)
steve@newlawoffice.com


Kevin W. Thompson, Esq. (W.Va. Bar No. 5062)
David R. Barney, Jr., Esq. (W.Va. Bar No. 7958)
Melissa Ellsworth, Esq. (W.Va. Bar No. 13609)
Sarah Surber, Esq. (W.Va. Bar No. 10460)
Thompson Barney
2030 Kanawha Boulevard, East
Charleston, West Virginia 25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@thompsonbarneylaw.com
drbarneywv@gmail.com
mellsworth@thompsonbarneylaw.com
ssurber@thompsonbarneylaw.com


Celeste Brustowicz (pro hac vice pending)
Barry J. Cooper, Jr. (pro hac vice pending)
Stephen H. Wussow (pro hac vice pending)
Victor Cobb (pro hac vice pending)
The Cooper Law Firm, LLC
1525 Religious Street
New Orleans, LA  70130
Telephone: (504) 399-0009
cbrustowicz@clfnola.com
bcooper@clfnola.com
swussow@clfnola.com
vcobb@clfnola.com

Donald Creadore, Esq. (pro hac vice pending)
Creadore Law Firm, P.C.
450 Seventh Ave., Suite 1408
New York, NY 10123
Telephone: 212.355.7200
Donald@creadorelawfirm.com

James F. Clayborne (pro hac vice pending)
CLAYBORNE, SABO & WAGNER, LLP
525 West Main Street, Suite 105
Belleville, IL  62220
Telephone:  618-239-0187
Facsimile:  618-416-7556
jclayborne@cswlawllp.com